UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
COLUMBUS DIVISION

| | |
|---|---|
| THE BUCKEYE INSTITUTE,<br>   Plaintiff,<br>vs.<br>INTERNAL REVENUE SERVICE, *et al.*,<br>   Defendants. | Civil Action No. 2:22-cv-04297<br><br>Hon. Michael H. Watson,<br>United States District Judge<br><br>Hon. Elizabeth P. Deavers,<br>United States Magistrate Judge |

PLAINTIFF THE BUCKEYE INSTITUTE'S
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff The Buckeye Institute respectfully moves for Summary Judgment. As forth more fully in the Memorandum in Support that follows, the material facts are not disputed and The Buckeye Institute is entitled to judgment as a matter of law.

MEMORANDUM IN SUPPORT

INTRODUCTION

Just two years ago, the Supreme Court facially invalidated a California law that required tax-exempt charities to provide confidential information about their donors to the government as a matter of course. *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021) ("*AFPF*"). Absent "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," the Supreme Court explained, compelling charitable organizations to disclose the

names of their donors violates the First Amendment right to association. *Id.* at 2383. Indeed, "it is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* at 2382 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)). The Supreme Court thus prevented California from enforcing its across-the-board requirement that every nonprofit organization turn over this sensitive information. *Id.* at 2389.

This case asks the Court to apply *AFPF*'s rule to the IRS's virtually identical across-the-board requirement that 501(c)(3) organizations disclose their substantial contributors to the federal government. In fact, this case is easier than *AFPF* because—unlike the California Attorney General—the IRS has acknowledged it has no good reason for indiscriminately collecting donor names and addresses for 501(c) organizations other than a 501(c)(3). And the IRS cannot possibly explain why doing so for 501(c)(3)'s is any different.

Because the federal statute requiring 501(c)(3) organizations to disclose their donors is substantively identical to California's disclosure requirement, Buckeye is entitled to summary judgment and a permanent injunction.

FACTUAL BACKGROUND

*The Buckeye Institute*

Buckeye, a nonprofit corporation that is tax exempt under § 501(c)(3), seeks to promote limited and effective government and individual freedom through policy research and advocacy. Alt Decl., ¶¶ 2–3. Buckeye often serves as a government

2

watchdog, litigating against federal, state, and local authorities to defend constitutional rights. *Id.* ¶ 3. Buckeye relies on contributions from those who share its values and wish to advance its mission. *Id.* ¶ 5.

*The Regulatory Framework*

Each organization exempt from taxation under Section 501(c)(3) must annually disclose to the Treasury Secretary "the total of the contributions and gifts received by it during the year, and the names and addresses of all substantial contributors." 26 U.S.C. § 6033(b)(5). Substantial contributors are those whose aggregated contributions total more than $5,000, so long as such amount is more than 2 percent of the total contributions received by the organization in the reported tax year. *Id.* § 507(d)(2)(A). The IRS implements this law by requiring § 501(c)(3) organizations like Buckeye to disclose their "substantial contributors" on Schedule B to Form 990, which they must file annually. *See* Exhibit A, "Schedule of Contributors."

Schedule B filings are available for public inspection upon request. *See* 26 U.S.C. § 6104(d)(1). But the IRS must protect the confidentiality of donor information by redacting the names and addresses of contributors before producing any Schedule B information to the public. S*ee id.* § 6104(d)(3)(A). The redaction process is imperfect and "poses a risk of inadvertent of inadvertent disclosure." *See* Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31959, 31963 (May 28, 2020).

*The Treasury Department Confirms It Does Not Need Schedule Bs*

For almost fifty years, all § 501(c) organizations had to provide donor information when filing their Form 990. Although § 6033(b)(5)'s donor-disclosure requirement only applied to § 501(c)(3) organizations, in 1971 the IRS extended the requirement to all other exempt organizations, such as Section 501(c)(4) social welfare organizations and 501(c)(6) trade associations, by promulgating 26 C.F.R. § 1.6033-2(a)(2)(ii)(F). *See* 85 Fed. Reg. at 31906. Other than the types of organizations included, the 1971 rule's donor-disclosure requirement was substantively identical to that found in Section 6033(b).

The IRS revoked this regulation half a century later. It considered whether the marginal utility from annually collecting private donor information from all 501(c) organizations matched the risk of disclosure of confidential information. The Treasury Department concluded that disclosing substantial contributors on Schedule B was unnecessary to perform its duties in preventing fraud and enforcing the tax code.

On July 16, 2018, the Treasury Department issued Revenue Procedure 2018-38, which revoked the disclosure rule for 501(c) organizations other than those organized under 501(c)(3). *See* Exh. B, Revenue Proc. 2018-38. "The IRS does not need personally identifiable information of donors to be reported on Schedule B of Form 990 or Form 990-EZ in order to carry out its responsibilities." *Id.* at 5. But "[t]he requirement to report [donor identities] increases compliance costs for some private parties, consumes IRS resources in connection with the redaction of such

4

information, and poses a risk of inadvertent disclosure of information that is not open to public inspection." *Id.* "Americans," the Treasury Secretary explained, "shouldn't be required to send the IRS information that it doesn't need to effectively enforce our tax laws, and the IRS simply does not need tax returns with donor names and addresses to do its job in this area." Exh. C, Press Release, *Treasury Department and IRS Announce Significant Reform to Protect Personal Donor Information to Certain Tax-Exempt Organizations* (July 16, 2018) (NYNJ-0000723).[1]

In separate July 17, 2018, letters to the Chairman of the House Committee on Oversight and Government Reform and the Chairman of the Senate Committee on Homeland Security and Government Affairs, the then-IRS Commissioner outlined why the agency intended to stop collecting Schedule B information:

> First, the IRS does not need personally identifiable information of donors to be reported on Schedule B . . . in order to carry out its responsibilities. . . . Second, reporting donor information needlessly consumes both private and governmental resources. . . . Third, continued collection of personally-identifying donor information poses an unnecessary risk of inadvertent disclosure of sensitive, confidential information.

Exh. D, Letter to Chairman Gowdy at NYNJ-0000571 (July 17, 2018); Exh. E, Letter to Chairman Johnson at NYNJ-0000936 (July 17, 2018). That reasoning matched an August 2018 IRS presentation entitled "Tax Exempt and Government

---

[1] In 2019, a district court voided Revenue Procedure 2018-38 on procedural, nonsubstantive grounds. *Bullock v. IRS*, 401 F. Supp. 3d 1144, 1159 (D. Mont. 2019). The IRS later published final regulations in May 2020 eliminating the Schedule B donor-disclosure requirement for all Section 501(c) organizations other than those governed by Section 501(c)(3). *See* 85 Fed. Reg. at 31959.

Entities: Disclosure Risk on Form 990, Schedule B and Rev. Proc. 2018-38," which included a slide stating that the "IRS does not systematically use Schedule B; the lack of a Taxpayer Identification Number makes the data unsuitable for electronic matching." Exh. F at NYNJ-0000722. The slide further explained that the IRS "doesn't cross-walk charitable deductions . . . to Schedule B." *Id.* In other words— the IRS does not use Schedule Bs for any kind of automated fraud detection because it cannot electronically match donor identities on a Schedule B to individual taxpayers.

The IRS confirmed again in 2020 that Schedule Bs do not assist the IRS in administering the tax code. The IRS issued supplementary information to explain its decision removing the disclosure requirement for 501(c)s and addressed whether doing so would make the IRS "not . . . as efficient in enforcing federal tax laws." 85 Fed. Reg. at 31963. "For the specific purpose of evaluating possible private benefit or inurement or other potential issues relating to qualification for exemption," the government explained, "the IRS can obtain sufficient information from other elements of the Form 990 or Form 990-EZ and can obtain the names and addresses of substantial contributors along with other information, upon examination, as needed." *Id.* The IRS stated further that eliminating the requirement that contributors be disclosed on Schedule B reduced the risk of "inadvertent disclosure," and thus protected against "possible reprisals (such as harassment, threats of violence, or economic retribution)." *Id.* at 31963. As with Revenue Procedure 2018-38, exempt organizations affected by the May 2020 Regulations were still required

6

to "maintain the names and addresses of their substantial contributors in their books and records . . . in order to permit the IRS to efficiently administer the internal revenue code." *Id.* at 31966.

*The IRS Fails to Keep Taxpayer Information Confidential*

The risk that confidential donor information might be released is not hypothetical. The IRS knows of at least 14 unauthorized disclosures of Form 990 information since 2010. *See* Exh. G, IRS Talking Points at 3. In one case, the IRS unlawfully released an organization's unredacted Schedule B donor list to an individual posing as a journalist.[2] *See Nat'l Org. for Marriage, Inc. v. United States*, 807 F.3d 592, 594–95 (4th Cir. 2015). The individual sent the information to one of the group's ideological opponents, which forwarded it to a media outlet—then both published it online. *Id.*

That's not all. In June 2021, the activist group ProPublica managed to get its hands on a "trove" of taxpayer data held by the IRS, which it then published online. Exh. H, Jesse Eisinger, Jeff Ernsthausen, & Paul Kiel, *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, ProPublica (June 8, 2017), available at https://perma.cc/Q6GS-YZYR. The leaked information remains available today. *See id.* (original source visited May 2, 2023). And in September 2022, the IRS disclosed that it mistakenly posted private

---

[2] The disclosure is, of course, illegal regardless of the recipient's profession. But the fact that the recipient claimed to be a journalist indicates that the leaker understood and intended for the confidential information to be broadly published.

information from 990-T forms, affecting more than 120,000 taxpayers. *See* Exh. I, Letter to Chairman Thompson, House Homeland Security Committee from Anna Roth, Acting Assistant Secretary for Management, Treasury Dept., available at https://perma.cc/J7EY-XYBY.

These leaks surprise no one, given that a 2014 Inspector General report concluded that "[u]ntil the IRS takes steps to improve its security program deficiencies and fully implement all security program components in compliance with [statutory standards for information security], taxpayer data could be vulnerable to inappropriate and undetected use, modification, or disclosure." Exh. J, Treasury Inspector General for Tax Administration, *Annual Assessment of the IRS's Information Technology Program for Fiscal Year 2021* at 11 (December 14, 2021), available at https://perma.cc/QAZ6-WNH2.

*The Compelled Disclosure Regime Chills Buckeye and Its Supporters*

Like most who advocate positions on public policy issues, Buckeye and its supporters prize their First Amendment freedom to associate and assemble. Alt Decl., ¶ 7. Their exercise of these rights to associate with each other in pursuing their mutual social, political, and ideological goals is significantly curtailed because they reasonably fear that they cannot associate privately. *Id.* ¶¶ 7–9. Buckeye's supporters have made clear they fear retribution from Buckeye's opponents—be they government or private actors. *Id.* ¶ 8.

Buckeye has experienced firsthand the chilling effect that fear of retaliation has on its supporters' willingness to associate with it. For example, in 2013, Buckeye

8

actively and publicly opposed Ohio's expansion of the federal Medicaid program. *Id.* ¶ 10. Shortly after Ohio's General Assembly rejected the Medicaid expansion, the IRS's Cincinnati office informed Buckeye that it would be audited. *Id.* Fearing that the audit was politically motivated retaliation, Buckeye contributors expressed concern that they would be subjected to retaliatory audits if their names appeared on Buckeye's Schedule B or were otherwise disclosed to the IRS. *Id.* ¶ 11. Buckeye supporters cited the then-unfolding story regarding the agency's disparate, adverse treatment of conservative-leaning organizations applying for nonprofit status. *See id.*; Exh. K, S. Rep. No. 114-119 - *The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted by "Political Advocacy" Organizations*, pt. 1 at 11 (2015) (excerpt of report attached as exhibit; full report available at https://perma.cc/NWU8-EZG3). The controversy directly implicated the IRS's Cincinnati office, which was auditing Buckeye. Alt Decl., ¶¶ 10–11; Exh. L, Gregory Korte, *Cincinnati IRS agents first raised Tea Party issues*, USA Today (June 11, 2013), available at https://perma.cc/DNK9-NVR6.

To avoid potential retribution based on their association with Buckeye, some individuals chose to give anonymously, but legally, through donor advised funds, while at least one individual made an anonymous donation via cashier's check, thereby foregoing a donation receipt (as well as the tax deduction for his charitable contribution). Alt Decl., ¶ 11. And some donors reduced their donations to avoid appearing on Buckeye's Schedule B as "substantial contributors." *Id.*

9

Privacy-conscious contributors have expressed concerns about contributing to Buckeye because they do not trust the IRS to properly protect and not to misuse their data. *See* Alt Decl., ¶ 12. Explaining their reticence, some supporters have pointed to the harassment and abuse of a California initiative's supporters following the unlawful disclosure of their identities. *Id.* ¶ 13; *see also Nat'l Org. for Marriage*, 807 F.3d at 594–95.

Buckeye's loss of revenue resulting from donors' decisions to stop or reduce their giving limits out of fear of retaliation limits its ability to speak about matters of public concern, as well as to associate and assemble with like-minded citizens. *Id.* ¶ 14–15.

### ARGUMENT

Congress's decision to require upfront, indiscriminate collection of donor information for 501(c)(3)'s cannot overcome exacting scrutiny. The IRS has stated—too many times to count—that it does not rely on Schedule Bs to assess taxpayer qualification, investigate and prevent fraud, or otherwise administer and enforce the tax code. That is because the IRS can obtain all the information it needs through targeted requests. It has no need for the "dragnet" collection that Congress mandated. *See AFPF*, 141 S. Ct. at 2387. And enforcing the law creates an "inevitable" chill against exercising the First Amendment right to associate. *Id.* at 2383. The Court should grant summary judgment, declare that § 6033(b)(5) violates the First Amendment, and permanently enjoin the IRS's upfront collection of donor information.

I.     SECTION 6033(B)(5)'S DONOR-DISCLOSURE REQUIREMENT FAILS EXACTING SCRUTINY.

The First Amendment protects Buckeye and its supporters' right to privacy in associating with each other. The Supreme Court has "recognized a First Amendment right to associate for the purpose of speaking, which [it has] termed a 'right to expressive association.'" *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 68 (2006) (citations omitted) (*"FAIR"*). The Constitution protects association because "[t]he right to speak is often exercised most effectively by combining one's voice with the voices of others." *Id.* "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *AFPF*, 141 S. Ct. at 2382. "If the government were free to restrict individuals' ability to join together and speak, it could essentially silence views that the First Amendment is intended to protect." *FAIR*, 547 U.S. at 68.

To that end, the right to associate also includes the right to do so privately. A "vital relationship [exists] between freedom to associate and privacy in one's associations." *AFPF,* 141 S. Ct. at 2382 (quoting *NAACP,* 357 U.S. at 462). "[I]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* (quoting *NAACP*, 357 U.S. at 462). Thus, the Supreme Court held just two years ago, laws compelling groups to

11

disclose the identity of their donors must overcome exacting scrutiny. *Id.* at 2383.[3] This standard applies "[r]egardless of the type of association" at issue. *Id.*

Exacting scrutiny is a rigorous standard. "Under that standard, there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* (internal quotation marks omitted). And even if the government can identify a substantial relationship between a disclosure regime and an important government interest, "the challenged requirement must be narrowly tailored to the interest it promotes." *Id.* at 2384.

> A. *No substantial relation exists between the upfront collection of Schedule B information and the government's regulation of 501(c)(3) organizations.*

Upfront disclosure of donor identities on the Schedule B does not further any government interest—important or otherwise. The IRS already acknowledged that this is true for *non-*501(c)(3) organizations. *See* Exh. B at 5; 85 Fed. Reg. at 31963; *see also* Exh. D at NYNJ-0000751 & Exh. E at NYNJ-0000936. In doing so, the IRS categorically rejected the standard justifications for requiring upfront disclosure: "The IRS does not need personally identifiable information of donors to be reported on Schedule B . . . to carry out its responsibilities." Ex. B at 5. The IRS has further explained that disclosure does not meaningfully assist the IRS in preventing 501(c)

---

[3] In *AFPF*, six justices agreed that disclosure laws must *at least* meet exacting scrutiny "[r]egardless of the type of association" at issue. *Id.* Justice Thomas argued that strict scrutiny—a higher standard—should apply. *Id.* at 2390 (Thomas, J., concurring). And Justices Alito and Gorsuch agreed that because the law at issue in *AFPF* did not meet exacting scrutiny, the Court need not decide whether strict scrutiny should apply. *Id.* at 2392 (Alito, J., concurring).

organizations from impermissibly operating for private benefit or for assessing "other potential issues relating to qualification for [tax] exemption." 85 Fed. Reg. at 31963. And the IRS has also stated that because "the primary utility of the names and addresses of substantial contributors arises during the examination process," it can obtain that information as needed with ease. *Id.*

The IRS also rejected the notion that it needs Schedule B information for the initial determination of whether an examination is warranted: "[T]he IRS's process for selection [for examination] would not be affected by this change." *Id.* In short, the federal government made clear that it does not need Schedule B information to do its job in enforcing and administering the tax code for all the other kinds of 501(c) organizations for which there is not a disclosure mandate.

The IRS cannot carry its burden of explaining why Schedule Bs are substantially related to an important government interest for 501(c)(3)s when they are all but irrelevant for other 501(c) organizations.

The most significant difference between 501(c)(3) organizations and other nonprofits is that contributions to 501(c)(3)s are tax-deductible, while contributions to other 501(c)s are not. Thus, one could imagine that the IRS might wish to use Schedule Bs to root out unscrupulous taxpayers claiming deductions for fictitious contributions. But Schedule B information does not assist the IRS in doing so. As the agency explained in 2018, the "IRS *does not* systematically use Schedule B" because it lacks the necessary information to conduct electronic matching. Exh. F at NYNJ-0000722 (emphasis added). That is, the IRS has no way to match information

13

on a Schedule B to specific taxpayers. *Id*. It cannot "cross-walk charitable deductions . . . to Schedule B." *Id*. The argument that the IRS needs this information upfront, before an examination, for systematic fraud prevention or quality assurance does not reflect reality.

Nor is there any substantial relationship between the collection of Schedule B information and a governmental interest in ensuring that a 501(c)(3) is not used as a shell to conduct for-profit activities. Form 990 requires 501(c)(3) entities to detail the grants and amounts paid, benefits to members, salaries of officers and employees, and as well as fundraising fees. *See, e.g.*, Exh. M, Form 990 Lines 13–17 and Form 990 Part VII. This detailed information required elsewhere on Form 990 may help the government analyze whether a non-profit is being operated as a shell to perform for-profit activities, but the donors' names and addresses do not.

Likewise, to the extent that the government seeks to prevent self-dealing by 501(c)(3) organizations, Schedule B provides little help. For example, Schedule D already requires a reconciliation of revenue and expenses from an organization's audited financial statements and its tax return, which paints a clear picture of the money flowing into and out of a 501(c)(3) organization. *See* Exh. N. Similarly, Schedule I requires 501(c)(3) organizations to report grants and other assistance to organizations, governments, and individuals in the United States, including the name and EIN of any such recipient organization as well as the purpose of the grant or other assistance. *See* Exh. O. Schedule J requires a 501(c)(3) organization to report its compensation information for officers, directors, trustees, key employees

14

and highest compensated employees. *See* Exh. P. The relationship between the collection of this information and the government interest in preventing self-dealing or other misuse of charitable funds is obvious: it shows where the money goes. The donor information on Schedule B adds nothing to that picture.

Worse, the mass collection of this information is not only unrelated to the important government interest that it purports to serve—thus rendering the statute unconstitutional—the IRS has complained in the context of non-501(c)(3) groups that warehousing the information is administratively *in*convenient because it must redact identifying information before releasing it in response to public requests. Exh. B at 5; 85 Fed. Reg. at 31963. The same inconvenience applies in the 501(c)(3) context.

### B. *Section 6033(b)(5) is not narrowly tailored.*

Even if the IRS could establish a substantial connection between collecting the Schedule B information and a sufficiently important interest, that alone will not justify encroachment on the First Amendment rights of Buckeye and its supporters. *See Davis v. FEC*, 554 U.S. 724, 744 (2008) (citing *Buckley v. Valeo*, 424 U.S. 1, 68, 71 (1976) (per curiam)). "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *AFPF*, 141 S. Ct. at 2383.

In *AFPF*, California argued that it needed donor information to enforce its laws governing charitable organizations—including 501(c)(3)s. California rightly noted

15

that it had an interest in "protecting the public from fraud" relating to the "misuse, misappropriation, and diversion of charitable assets" as well as preventing "false and misleading charitable solicitations." *AFPF*, 141 S. Ct. at 2386. But the only relation between those ends and collection of the Schedule B information that California could articulate was that "having th[e] information on hand ma[de] it easier to police misconduct by charities." *AFPF*, 141 S. Ct. at 2379. The Supreme Court rejected this justification, noting that the state's Attorney General could obtain any information needed from a specific organization through a subpoena or audit letter. *Id.* at 2386. Although the Court did "not doubt that California has an important interest in preventing wrongdoing by charitable organizations," there was "a dramatic mismatch" between the up-front collection of donor identities from all 60,000 charities registered to fundraise in the state and that interest. *Id.* at 2385–86. "California is not free to enforce *any* disclosure regime that furthers its interest. It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id.* at 2386.

The IRS's across-the-board collection and storage of Schedule B donor data likewise far exceeds what might be needed to further an important government interest in enforcing the tax code. Almost 1.5 million tax-exempt organizations filed a Form 990 in fiscal year 2019. Exh. Q, Treasury Inspector General for Tax Administration, *Obstacles Exist in Detecting Noncompliance of Tax-Exempt Organizations* at 6 (Feb. 17, 2021). While it is not clear how many of those returns included donor information on a Schedule B (because not every 501(c)(3) will

16

necessarily have substantial contributors), the IRS collects at least as many Schedule Bs from 501(c)(3) organizations as California did in *AFPF*. But the IRS does not use Schedule B information in a systematic way to identify which returns to examine. Exh. F at NYNJ-0000722. The donor information on a Schedule B cannot be "cross-walk[ed]" with information related to individual charitable deductions. *Id.* The same "dramatic mismatch" between the mass collection of information and the way the government uses that information, which caused California's law to fail narrow tailoring, exists here as well—indeed, it is arguably worse because not every 501(c)(3) that files a Schedule B operates in California, but all such organizations file a Schedule B with the IRS. *See* 141 S. Ct. at 2386.

Any legitimate investigative interest can be served without burdening the First Amendment rights of the more than one million § 501(c)(3) organizations and their supporters. As the Supreme Court reminded California's Attorney General, *see AFPF*, 141 S. Ct. at 2386–87, the IRS, too, could obtain the same information upon examination as needed instead of collecting up-front the names and addresses of substantial contributors to all Section 501(c)(3) organizations. In fact, that is what the IRS said when it rescinded its regulation for other 501(c)s in 2020. 85 Fed. Reg. at 31963. Because the federal government's interest in regulating 501(c)(3)s to prevent fraud or misuse of the charitable code is nearly identical to California's interests, that same dramatic mismatch exists here.

That the IRS is legally required to keep donor identities confidential does not save Section 6033(b)(5)'s poor tailoring. "[D]isclosure requirements can chill

17

association even if there is no disclosure to the general public." *AFPF*, 141 S. Ct. at 2388 (cleaned up). And "[w]hile assurances of confidentiality may reduce the burden of disclosure to the [government], they do not eliminate it." *Id.* That is particularly true here, given the IRS's difficulty in keeping taxpayer data confidential. *See, e.g.*, Exh. F at NYNJ-0000718; Exh. G. at 3; 85 Fed. Reg. at 31963; *supra* at 6–7.

C. *Section 6033(b)(5)'s donor-disclosure requirement is unconstitutional on its face, and as applied to Buckeye.*

The Supreme Court facially struck down California's Schedule B demand. *AFPF*, 141 S. Ct. at 2385, 2387–89. This Court should do the same with § 6033(b)(5), as its demand that 501(c)(3) organizations submit Schedule Bs as a matter of course fails exacting scrutiny in every case. As discussed above, there is no "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 2383 (cleaned up). And the challenged requirement is not narrowly tailored to the interest it allegedly promotes. *Id.* at 2384.

Just like in *AFPF*, these problems exist "across the board." *Id.* at 2389. The IRS does not systematically use Schedule Bs to prevent or investigate potential fraud or other discrepancies. "That is true in every case." *Id.* The IRS admits that it can obtain any information on a Schedule B as needed, rather than upfront. "That is true in every case." *Id.* And any interest the IRS has "in amassing sensitive information for its own convenience is weak." *Id.* "That is true in every case." This court should thus find § 6033(b)(5) unconstitutional on its face "because First Amendment freedoms need breathing space to survive." *Id.*

18

Yet even if the IRS could point to some permissible scenario for collecting Schedule B data upfront, the statute is unconstitutional as applied to Buckeye. "In an as-applied challenge, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposed to act, would be unconstitutional." *Ross v. Duggan*, 402 F.3d 575, 582 n.3 (6th Cir. 2004) (quoting *Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir. 1977)). If the Court rejects Buckeye's facial challenge, it should consider Buckeye's "particular context" and invalidate the law as-applied to Buckeye. *Id.*

There is no substantial relation between the statute's disclosure requirement and any important governmental interest necessary to demand this information of Buckeye, and the IRS has narrower, less-intrusive means of addressing any investigative interests. Moreover, fear of government reprisal or other abuse of donor information has deterred—and continues to deter—individuals who are otherwise inclined to do so from associating with and supporting Buckeye financially, which in turn impairs Buckeye's ability to speak. Alt Decl., ¶¶ 11–15.

II. THE COURT SHOULD PERMANENTLY ENJOIN THE DONOR-DISCLOSURE REQUIREMENT.

"A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Saieg v. City of Dearborn*, 641 F.3d 727, 733 (6th Cir. 2011). The donor-disclosure rule violates Buckeye's First Amendment right to association for the reasons discussed above. And "'[t]he loss of First Amendment freedoms, for even minimal periods of time,' amounts to irreparable injury." *Sisters*

19

*for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022) (quoting *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam)). Buckeye is thus entitled to a permanent injunction to prevent further harm to its constitutional rights.

## CONCLUSION

The Court should grant Buckeye's motion for summary judgment, enter a judgment declaring that 26 U.S.C. § 6033(b)(5) violates the First Amendment, and permanently enjoin the defendants from collecting the names and addresses of Buckeye's contributors under 26 U.S.C. § 6033(b)(5).

Dated: May 3, 2023.

Alan Gura*
Brett R. Nolan*+
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036
(202) 301-3300
agura@ifs.org
bnolan@ifs.org

*admitted pro hac vice*
*+ admitted only in Kentucky,*
*supervised by D.C. bar members*
*under D.C. App. R. 49(c)(8)*

Counsel for Plaintiff

Respectfully submitted,

/s/ Jay R. Carson
Jay R. Carson (Ohio 0068526)
   Trial Attorney
Robert Alt (Ohio 0091753)
David C. Tryon (Ohio 0028954)
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, OH 43125
(614) 224-4422
j.carson@buckeyeinstitute.org
robert@buckeyeinstitute.org
d.tryon@buckeyeinstitute.org