## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**THE BUCKEYE INSTITUTE,**

     **Plaintiff,**

       **v.**

**INTERNAL REVENUE SERVICE, ET AL.,**

     **Defendants.**

**Case No. 2:22-cv-04297**

**Judge Michael H. Watson**

**Magistrate Judge Elizabeth A. Deavers**

---

### *AMICI CURIAE* BRIEF OF ADVANCING AMERICAN FREEDOM FOUNDATION, OTHER TAX-EXEMPT ENTITIES, AND CURRENT AND FORMER BOARD MEMBERS OF TAX-EXEMPT ENTITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

ADVANCING AMERICAN FREEDOM
FOUNDATION, et al.

Frank M. Strigari (OH 0078377)
ZAINO HALL & FARRIN LLC
41 South High Street
Suite 3600
Columbus, OH 43215
(614) 326-1120
fstrigari@zhflaw.com

J. Marc Wheat
General Counsel (Va. Bar No. 39602)
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

Jason Torchinsky (Va. Bar No. 47481)
Shawn Sheehy (Va. Bar No. 82630)
Daniel Bruce (Va. Bar No. 98120)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808
jtorchinsky@holtzmanvogel.com
ssheehy@holtzmanvogel.com
dbruce@holtzmanvogel.com

*Counsel for Proposed Amici Curiae Advancing American Freedom Foundation, et al.*

## INTEREST OF AMICI CURIAE

The Advancing American Freedom Foundation ("AAFF") is a not-for-profit corporation based in Indianapolis, Indiana, and organized under Section 501(c)(3) of the Internal Revenue Code. Founded by former Vice President Mike Pence, AAFF promotes and defends conservative policies and traditional American values that have yielded unprecedented prosperity at home and restored America's strength abroad. As a 501(c)(3) organization, AAFF is required to file a Schedule B along with its annual IRS Form 990. AAFF has a substantial interest in ensuring its contributors' associational rights are not infringed by Schedule B's overbroad and unnecessary disclosure requirements. In addition, ensuring continued robust protection of the First Amendment freedoms of speech and association is a core aspect of AAFF's mission.

AAFF is joined by over 70 other tax-exempt organizations and three individuals who are likewise interested in ensuring 501(c)(3) organizations and their donors receive the robust protection against compelled disclosure mandated by the

First Amendment. For a full list of Amici, see the Memorandum in Support of Proposed Amici Curiae's Motion for Leave to File *Amici Curiae* Brief in Support of Plaintiff's Motion for Summary Judgment.[1]

## INTRODUCTION

The First Amendment rights to free speech and association are foundational to American freedom. The compelled disclosure of donor information required by 26 U.S.C. § 6033(b)(5) infringes on these rights. During the McCarthy and Civil Rights eras, in the midst of relentless attacks on individual freedoms, the First Amendment stood as a bulwark protecting core speech and associational rights. Cases from these eras made it clear that compelled disclosure of speakers' associations must survive exacting scrutiny.

In *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), the United States Supreme Court applied this standard and held that a state's compelled disclosure of the same donor information at issue here violates the First Amendment. Despite the Internal Revenue Service's ("IRS") protestations, this is the same case. Just like the State of California, the IRS fails to demonstrate any need for the compelled up-front disclosure of Schedule B's donor information to further its interest in revenue collection. Because the compelled disclosure is both under- and over-inclusive in furthering the IRS's interest, and cannot be justified based on administrative convenience, it fails exacting scrutiny. And just as California failed to

---

[1] Amici affirm that no counsel for any party authored this brief in whole or in part. Additionally, no counsel for any Party made any monetary contribution to the preparation or submission of this brief. No person other than AAFF made a monetary contribution to the preparation and submission of this brief.

ensure the confidentiality of donor information, the IRS's history of mishandling confidential taxpayer information threatens to chill the speech and association rights of 501(c)(3) organizations and their donors. Accordingly, the Court should grant Plaintiff's motion for summary judgment.

## ARGUMENT

### I. The First Amendment protects 501(c)(3) organizations and their donors from unjustified compelled disclosure of donor information.

The First Amendment protects the rights to free speech and association. Informed by vigorous attempts to silence the speech of disfavored groups in the McCarthy and Civil Rights eras, the Supreme Court has repeatedly held that compelled disclosure of a speaker's associations must survive exacting scrutiny. Indeed, the Court has already invalidated a substantially similar disclosure regime under this standard, and this Court should do the same here.

### A. During the McCarthy and Civil Rights eras, the First Amendment stood as a bulwark protecting core associational rights.

The McCarthy and Civil Rights eras presented some of the biggest threats to individual freedoms in our nation's history and tested First Amendment protections against compelled disclosure. Yet, associational rights stood strong. Cases from this era poignantly demonstrated three pillars of compelled disclosure jurisprudence.

First, these cases recognized that the First Amendment protects the right to private association. When Alabama sought to run the NAACP out of the state by obtaining its membership list, and when New Hampshire sought to compel a citizen

4

to reveal his associations with groups engaged in alleged "subversive activities," the First Amendment stood in the way. *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460–61 (1958); *DeGregory v. Attorney General of N.H.*, 383 U.S. 825 (1966). "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP*, 357 U.S. at 460. Furthermore, "privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462. For these reasons, compelled disclosure of a speaker's affiliations "constitute[s] a[n] effective . . . restraint on freedom of association." *Id.*

Second, these cases highlighted the dangers that stem from compelled disclosure, including harassment, economic reprisal, and physical harm. In *NAACP*, the Court noted that, because of these harms, compelled disclosure of the NAACP's membership list "may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs . . . and of the consequences of this exposure." *Id.* at 463. Consequences like these led Justice Douglas to observe in his concurrence in *Thomas v. Collins*, a case about a state's attempt to silence labor organizers, that economic threats, particularly when used to influence First Amendment rights, receive no First Amendment protection themselves. *See* 323 U.S. 516, 543 (1945) (Douglas, J., concurring).

Third, these cases repeatedly emphasized that government attempts at compelled disclosure must survive the "closest scrutiny." *NAACP*, 357 U.S. at 460–61. The government has no "power to expose for the sake of exposure." *Watkins v.*

*United States*, 354 U.S. 178, 200 (1957). Rather, "it is an essential prerequisite" to permitting compelled disclosure that the government "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 546 (1963). Moreover, the "fit" of the government's chosen action matters—"even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488 (1960). Thus, cases from this era set a demanding standard for governments to meet when seeking to compel disclosure of a speakers' associations.

### B. Informed by these cases, courts apply exacting scrutiny to government infringement on the freedom of association through compelled disclosure.

Relying on these cases, the Supreme Court, just a few terms ago, clarified that government attempts at compelled disclosure must survive "exacting scrutiny." *Bonta*, 141 S. Ct. at 2382–83. To do so, the government must prove "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). The Court noted that this standard "is appropriate given the 'deterrent effect on the exercise of First Amendment rights' that arises as an 'inevitable result of the government's conduct in requiring disclosure.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976) (per curiam)).

6

Importantly, the disclosure regime must be "narrowly tailored to the government's asserted interest." *Id.* And to be sure, this is an exacting standard—"even a 'legitimate and substantial' government interest 'cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Id.* at 2384 (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

Post-*Bonta*, courts have applied this exacting scrutiny standard exactingly. *See, e.g.*, *New Ga. Project, Inc. v. Carr*, No. 1:22-cv-03533, 2022 U.S. Dist. LEXIS 224818, at *53–54 (Dec. 14, 2022) ("[A] law that renders anyone who spends $500 on constitutionally-protected expression a full-fledged campaign committee subject to the attendant chilling effects is not a permissible means of regulation."); *Lakewood Citizens Watchdog Grp. v. City of Lakewood*, No. 21-cv-01488, 2021 U.S. Dist. LEXIS 168731, at *32–36 (D. Colo. Sept. 7, 2021) (invalidating ordinance compelling disclosure of *all* donors of more than $250 annually to an organization that spends $500 or more on an electioneering communication, even though a particular donor may or may not support the contents of the particular communication). Here, exacting scrutiny is likewise a major hurdle for the IRS's attempt at compelled disclosure.

### C. The Supreme Court has already held that compelled disclosure of donor information in Schedule B fails exacting scrutiny, and this Court must do the same.

To make things easier, the Supreme Court already decided this issue in *Bonta*—compelled disclosure of donor information contained in the IRS's very own Schedule B fails exacting scrutiny. *Bonta*, 141 S. Ct. at 2389 ("[T]he up-front collection of Schedule Bs is facially unconstitutional, because it fails exacting

scrutiny."). The parties are different, but the "dragnet" method of disclosure and "real and pervasive" harms are very much the same. *Id.* at 2387–88. A faithful application of *Bonta* in this case requires invalidating 26 U.S.C. § 6033(b)(5)'s compelled disclosure requirement.

In *Bonta*, the Supreme Court held that the California Attorney General's requirement that tax-exempt entities submit their IRS Form 990, including Schedule B, in order to renew their registrations as state charitable organizations each year, infringed on the organizations' First Amendment rights to speech and association. *Id.* at 2381, 2389. The compelled disclosure failed exacting scrutiny due to the "dramatic mismatch . . . between the interest that the Attorney General [sought] to promote and the disclosure regime that he . . . implemented." *Id.* at 2386. While California undoubtedly had "an important interest in preventing wrongdoing by charitable organizations," it did "not rely on Schedule Bs to initiate investigations," and there were alternative means of obtaining Schedule B information when needed. *Id.* at 2385–87. Additionally, the fact that "California was unable to ensure the confidentiality of donors' information," *id.* at 2381, underscored "[t]he gravity of the privacy concerns in this context." *Id.* at 2388.

The same is true here, and the IRS's attempts to distinguish this case from *Bonta* fall flat. Whether the compelled disclosure requirement "is a rational condition on an opt-in benefit" is a red herring. Defs.' Mot. for Summ. J. at 2–3. The same was true in *Bonta* (the disclosure of Schedule Bs was a condition of operating as a charity in the state), and regardless, "[i]t is rudimentary that the State cannot exact as the

price of those special advantages the forfeiture of First Amendment rights." *Austin v. Mich. State Chamber of Com.*, 494 U.S. 652, 680 (1990) (Scalia, J., dissenting), *overruled by Citizens United v. FEC*, 558 U.S. 310 (2010). Further, while the IRS argues that Plaintiff has not shown a reasonable probability of reprisal, *Bonta* rejected this very argument where a disclosure regime, like the one at issue here, is not narrowly tailored to an important government interest. *Bonta*, 114 S. Ct. at 2389.

Rather, just like California, the IRS cannot demonstrate any need for its sweeping, up-front compelled collection of 501(c)(3) organizations' donor information, and its long history of mishandling confidential information threatens to chill donors' First Amendment rights to speech and association.

## II. Schedule B's sweeping, up-front compelled disclosure of donor information fails exacting scrutiny because it is both under- and over-inclusive in furthering the IRS's revenue collection interest and cannot be justified based on administrative convenience.

The IRS asserts that Schedule B's sweeping, up-front compelled collection of donor information is necessary to properly administer the revenue code and protect the public fisc, both interests of great importance. Yet, the IRS permits almost all other 501(c) organizations to avoid disclosing the very information it claims is essential here, and alternative means of collecting the same information exist that would impose a lesser burden on 501(c)(3) organizations' First Amendment rights. Therefore, the up-front compelled disclosure of donor information is both under- and over-inclusive and fails exacting scrutiny.

**A. Schedule B's compelled disclosure is under-inclusive because it does not apply to similar organizations that pose similar problems to the IRS's revenue collection interest.**

A regulation on speech is not narrowly tailored to the government's asserted interest if it is "woefully underinclusive," or leaves similar speech that equally undermines the government's interest unregulated. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015); *Republican Party of Minn. v. White*, 536 U.S. 765, 779–80 (2002). In other words, "a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring) (citation and internal quotation marks omitted). Because the IRS has relieved other 501(c) organizations from the obligation to disclose donor information—and indeed has disclaimed any need for collecting such information from those organizations—continuing to subject 501(c)(3) organizations to this same disclosure requirement is under-inclusive.

As Plaintiff amply recounts in its briefs, in rolling back the disclosure requirement for non-501(c)(3) organizations, the IRS admitted that it "does not need the names and addresses of substantial contributors to tax-exempt organizations . . . . in order to administer the internal revenue laws." Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31959, 31963 (May 28, 2020). The government called concerns that the IRS would be less efficient in enforcing regulations on tax-exempt entities "misplaced." *Id*. Rather, the IRS assured the public that it "can obtain

sufficient information from other elements of the Form 990 . . . and can obtain the names and addresses of substantial contributors, along with other information, upon examination, as needed." *Id.* And the agency specifically reserved the right to do so by requiring organizations relieved of this obligation to "maintain [this information] in their books and records" in case of later inspection. *Id.* at 31966.

The IRS went even further and stated that the disclosure requirement actually imposes a "burden" on the IRS by forcing the agency to redact donor information before making Form 990s publicly available. *Id.* at 31964. And the agency also acknowledged the burden disclosure places on tax-exempt entities by increasing compliance costs and risking inadvertent disclosure. *Id.* at 31963–64.

There is no meaningful difference between 501(c)(3) organizations and other 501(c) organizations that justifies only applying the disclosure requirement to the former. The IRS claims that "[i]nformation as to the identities of substantial contributors can assist the IRS in identifying potential private inurement and private benefit issues." Defs.' Mot. for Summ. J. at 5–6. However, 501(c)(4) organizations are also prohibited from having "part of [their] net earnings . . . inure[] to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(4)(B). And while donor information may be relevant to determining whether certain excise taxes on excess benefit transactions apply under 26 U.S.C. § 4958, Defs.' Mot. for Summ. J. at 6, those taxes apply to *all* tax-exempt entities. Further, although donor information *could* help the IRS more easily police tax-deductions from donations to 501(c)(3) organizations, as Plaintiff's briefs explain, the IRS lacks the tools necessary to match

the donor information on Schedule B to individual taxpayers. Pl.'s Mot. for Summ. J. at 13–14. It is under-inclusive to use compelled disclosure to only police the activities of 501(c)(3) organizations when every other 501(c) organization presents the same dangers to the IRS's revenue collection interest.

### B. Schedule B's compelled disclosure is over-inclusive because it requires more disclosure than necessary to achieve the government's interest.

Similarly, 26 U.S.C. § 6033(b)(5) fails exacting scrutiny because it is over-inclusive. A regulation on speech is not narrowly tailored to the government's asserted interest if it proscribes "more speech than necessary" to further the government's interest. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997). This is particularly true where there are "alternatives available . . . that would serve the Government's . . . interest, while avoiding 'unnecessary abridgment' of First Amendment rights." *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) (quoting *Buckley*, 424 U.S. at 25).

Schedule B's sweeping, up-front compelled disclosure of donor information is over-inclusive because alternative methods are available that would enable the IRS to obtain this information when needed to fulfill its revenue collection duties. The IRS recognized as much with respect to non-501(c)(3) organizations: "For the specific purpose of evaluating possible private benefit or inurement . . . the IRS can obtain sufficient information from other elements of the Form 990," and "can obtain the names and addresses of substantial contributors . . . upon examination, as needed." 85 Fed. Reg. at 31963.

The same is true with respect to 501(c)(3) organizations. The IRS can still require 501(c)(3) organizations to maintain donor information for future inspection, and the IRS recognizes that it has the authority to inspect that information during an investigation. While the IRS claims that it uses Schedule B information to determine whether to initiate such investigations, it does not claim that Schedule B information is *necessary* for making such a determination. Absent this showing, it is clear that alternative, less restrictive means of furthering the IRS's revenue interest exist. Therefore, Schedule B's sweeping, up-front compelled disclosure is both under- and over-inclusive, and fails exacting scrutiny.

### C. Administrative convenience is not a sufficiently important government interest.

Stripped down, the IRS's asserted interests, just as California's in *Bonta*, sound merely in administrative convenience. Compelled disclosure may conceivably make it easier for the IRS to regulate 501(c)(3) organizations. But "[m]ere administrative convenience does not remotely 'reflect the seriousness of the actual burden' that the demand for Schedule Bs imposes on donors' association rights." *Bonta*, 141 S. Ct. at 2387 (quoting *Reed*, 561 U.S. at 196). The IRS has no power to require entities to disclose for the sake of disclosure. *Watkins*, 354 U.S. at 200.

### III. The IRS's history of mishandling confidential taxpayer information threatens to chill 501(c)(3) organizations and their donors' rights to speech and association.

In its Motion for Summary Judgment, the IRS asserts that its "strong track record" of complying with confidentiality provisions "minimizes any burden on Buckeye's contributors' First Amendment rights." Defs.' Mot. for Summ. J. at 14.

However, as *Bonta* recognized, "[w]hile assurances of confidentiality may reduce the burden of disclosure to the State, *they do not eliminate it.*" 141 S. Ct. at 2388 (emphasis added). In reality, the IRS routinely mishandles tax-exempt entities' information, is unable to prevent rogue employees from publicly disclosing taxpayer information, and has failed to adequately protect taxpayer information from external threats. These failures of confidentiality render the disclosure regime at issue just as constitutionally infirm as the one in *Bonta*.

### A. The IRS routinely mishandles tax-exempt entities' information, resulting in the unlawful disclosure of donor information.

The IRS's inability to protect the confidential information of tax-exempt entities and their donors reveals the acute danger Schedule B's sweeping compelled disclosure presents to these entities' core associational rights. For example, just last year, the IRS admitted that it mistakenly released taxpayer information associated with certain tax-exempt organizations contained in Form 990-T, which tax-exempt entities use to report unrelated business income.[2] Only 501(c)(3) organizations must make their Form 990-Ts publicly available. However, the *Wall Street Journal* reported that the IRS publicly disclosed as many as 120,000 individuals' names and contact information when it mistakenly made data from some non-501(c)(3) organizations available for bulk download from the IRS's website.[3]

---

[2] Brian Fung, *IRS Says It Mistakenly Exposed Taxpayer Data Belonging to Non-Profits*, CNN (Sept. 2, 2022), https://www.cnn.com/2022/09/02/politics/irs-taxpayer-data-nonprofits/index.html.

[3] Richard Rubin, *IRS Says It Exposed Some Confidential Taxpayer Data on Website*, WALL ST. J. (Sept. 2, 2022), https://www.wsj.com/articles/irs-says-it-exposed-some-confidential-taxpayer-data-on-website-11662145232.

The IRS's cavalier approach to protecting donor privacy goes back at least a decade. In 2012, the IRS released nine pending confidential applications for tax-exempt status submitted by conservative-leaning organizations to *ProPublica*.[4] This leak came from the same IRS office that, according to an Inspector General report, used "inappropriate criteria" to single out disfavored organizations for increased scrutiny in an election year.[5] And again, in 2013, the IRS handed over documentation for 31 groups, some of which had not been approved and were not supposed to be made public.[6] The IRS eventually agreed to a multimillion-dollar settlement.[7] In an unrelated incident, the IRS agreed to settle a lawsuit by National Organization for Marriage for $50,000 after an IRS employee failed to redact the names and addresses of its donors before disclosing the organization's Form 990 to a member of the media.[8]

These highly publicized scandals sparked significant public backlash and have reduced confidence in the IRS's ability to protect donors' confidential information. As the IRS inevitably increases audits of tax-exempt entities with its recent influx of $80 billion in funding,[9] failures like those outlined above are likely to continue.

---

[4] Kim Barker & Justin Elliott, *IRS Office that Targeted Tea Party Also Disclosed Confidential Docs from Conservative Groups*, PROPUBLICA (May 13, 2013), https://www.propublica.org/article/irs-office-that-targeted-tea-party-also-disclosed-confidential-docs.

[5] TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, INAPPROPRIATE CRITERIA WERE USED TO IDENTIFY TAX-EXEMPT APPLICATIONS FOR REVIEW 2 (May 14, 2013), https://www.documentcloud.org/documents/700643-201310053fr-revised-redacted-1.

[6] Barker & Elliott, *supra* note 4.

[7] Emily Cochrane, *Justice Department Settles with Tea Party Groups After I.R.S. Scrutiny*, N.Y. TIMES (Oct. 26, 2017), https://www.nytimes.com/2017/10/26/us/politics/irs-tea-party-lawsuit-settlement.html.

[8] Mackenzie Weinger, *IRS Pays $50K in Confidentiality Suit*, POLITICO (June 24, 2014), https://www.politico.com/story/2014/06/irs-nom-lawsuit-108266.

[9] Alex Muresianu, *IRS Strategic Operating Plant Shows Promise, but Concerns Remain*, TAX FOUND. (Apr. 13, 2023), https://taxfoundation.org/blog/irs-funding-plan-inflation-reduction-act/.

## B. IRS employees repeatedly leak confidential taxpayer information.

The IRS's inability to safeguard confidential taxpayer information extends beyond nonprofit donor information. For years, IRS employees have repeatedly leaked confidential taxpayer information. Most recently, in 2021, *ProPublica* revealed that it obtained "a vast trove of Internal Revenue Service data on the tax returns of thousands of the nation's wealthiest people, covering more than 15 years."[10] In a series of publications, the outlet used these "[s]ecret IRS files" to expose numerous Americans' confidential taxpayer information.[11]

Treasury Secretary Janet Yellen called the leak "a very serious situation."[12] The leak sparked the Senate Finance Committee to urge an immediate investigation into what it called "one of the most significant and widespread breaches in the agency's history" that "considerably damages . . . American taxpayers' confidence that the IRS will keep their personal information confidential."[13] Yet, as of February of

---

[10] Jesse Eisinger, Jeff Ernsthausen, & Paul Kiel, *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, PROPUBLICA (June 8, 2021), https://www.propublica.org/article/the-secret-irs-files-trove-of-never-before-seen-records-reveal-how-the-wealthiest-avoid-income-tax.

[11] *E.g.*, Paul Kiel, Ash Ngu, Jesse Eisinger, & Jeff Ernsthausen, *America's Highest Earners and Their Taxes Revealed*, PROPUBLICA (Apr. 13, 2022), https://projects.propublica.org/americas-highest-incomes-and-taxes-revealed/.

[12] Naomi Jagoda, *Yellen: Disclosure of Tax Data to* ProPublica *a "Very Serious Situation,"* THE HILL (June 16, 2021), https://thehill.com/policy/finance/558720-yellen-disclosure-of-tax-data-to-propublica-a-very-serious-situation/.

[13] Letter from the U.S. Senate Comm. on Fin. to the Honorable J. Russell George, Inspector Gen. for Tax Admin., at 1 (June 11, 2021), available at https://www.grassley.senate.gov/imo/media/doc/finance_republicans_to_treasury_inspector_general_for_tax_administration_-_irs_tax_info_breach.pdf.

this year, the IRS still had not explained "how this betrayal of taxpayer confidentiality happened or whether anyone has been held accountable."[14]

This story, in addition to the 2012 leak discussed above, is merely a symptom of a larger disease within the agency—IRS employees repeatedly access and disclose confidential taxpayer information without authorization. For example, a 2022 Government Accountability Office ("GAO") report found that "[b]etween fiscal years 2012 and 2021, IRS investigated more than 1,700 employee misconduct cases that included" unauthorized access to confidential taxpayer information.[15]  Of those cases, 204 alleged the employee disclosed information without authorization, 49 of which the IRS substantiated.[16]

A 2023 GAO report identified similar issues with respect to IRS contractors. The report found that the IRS lacked an unauthorized access training goal for contractors and noted that, "[a]s a result, IRS contractors are at increased risk of being unprepared to handle taxpayer information."[17] In addition, the IRS "does not do any centralized monitoring of contractor [unauthorized access] and unauthorized disclosure cases," resulting in "limited insight" into contractors' handling of confidential taxpayer information.[18]

---

[14] Letter from U.S. House of Representatives Comm. on Ways & Means to the Honorable J. Russell George, Inspector Gen. for Tax Admin., at 1 (Feb. 16, 2023), available at https://waysandmeans.house.gov/wp-content/uploads/2023/02/2.16.23-Ltr-to-TIGTA-on-ProPublica.pdf.
[15] U.S. GOV'T ACCOUNTABILITY OFF., GAO-22-105872, IRS SECURITY OF TAXPAYER INFORMATION: CHARACTERISTICS OF EMPLOYEE UNAUTHORIZED ACCESS AND DISCLOSURE CASES 9 (2022).
[16] Id. at 12, 14.
[17] U.S. GOV'T ACCOUNTABILITY OFF., GAO-23-105395, SECURITY OF TAXPAYER INFORMATION: IRS NEEDS TO ADDRESS CRITICAL SAFEGUARD WEAKNESSES (2023).
[18] Id. at 42.

To be sure, the IRS has made some progress toward reining in unauthorized disclosures. For example, 97 percent of IRS employees completed unauthorized access and disclosure training in fiscal year 2021.[19] And around 80 percent of the unauthorized access violations that occurred from 2012 to 2021 resulted in discipline for the offending employee.[20] However, these improvements do little to protect taxpayers and entities from rogue, activist employees that are more emboldened to leak confidential information in today's polarized world. The rate at which these incidents continue to occur leaves many taxpayers and entities waiting to see if they will be the next victim.

### C. The IRS has been unable to safeguard taxpayer information from external threats.

In addition to its failures to safeguard confidential taxpayer information internally, the IRS has repeatedly fallen victim to external data breaches due to inadequate security. For example, in 2014 and 2015, cyber criminals used a tool called "Get Transcript" on the IRS website to fraudulently access millions of tax documents for at least 720,000 Americans.[21] Notably, this incident was not a cyberattack. Rather, cyber criminals were able to abuse an online tool the IRS apparently offered to the general public without fully appreciating the implications for taxpayer privacy.

---

[19] *Id.*
[20] U.S. Gov't Accountability Off., *supra* note 15, at 16.
[21] Jose Pagliery, *IRS Taxpayer Data Theft Seven Times Larger Than Originally Thought*, CNN Business (Feb. 26, 2016), https://money.cnn.com/2016/02/26/technology/irs-data-theft/.

A 2016 GAO report identified numerous "weaknesses" in IRS systems "due in part to IRS's inconsistent implementation of its agency-wide security program."[22] GAO concluded that, because of these weaknesses, "taxpayer and financial data continue to be exposed to unnecessary risk."[23] Just this year, the GAO warned that "[w]eaknesses in IRS's information security controls presents risks to taxpayer information."[24] While the IRS has implemented some reforms, it "did not always do so timely" and should address existing concerns to better "identify cybersecurity threats and incidents."[25] In sum, the IRS has far from an unblemished track record in safeguarding taxpayer information, and donors are justified in fearing they could be the next victim of a leak.

### D. The First Amendment does not require proof that this substantial risk the IRS will leak donor information has or will lead to retaliation.

To be sure, the IRS's history of mishandling taxpayer information emphasizes *but is not necessary* to demonstrate the chilling effect of Schedule B's compelled disclosure of donor information. The First Amendment does not require evidence of retaliation or fear of retaliation to obtain its protections. *See Buckley v. Valeo*, 424 U.S. 1, 238 (1976) (Burger, C.J., concurring in part and dissenting in part) ("[T]his Court has seen to it that governmental power cannot be used to force a citizen to disclose his private affiliations, even without a record reflecting any systematic

---

[22] U.S. Gov't Accountability Off., GAO-16-589T, Information Security: IRS Needs to Further Improve Controls Over Taxpayer Data and Continue to Combat Identity Theft Refund Fraud (2016).

[23] *Id.*

[24] U.S. Gov't Accountability Off., *supra* note 17, at 2.

[25] *Id.*

harassment or retaliation." (citation omitted)); *AFL-CIO v. FEC*, 333 F.3d 168, 176 (DC. Cir. 2003) ("*Buckley* engaged in a full First Amendment analysis despite the absence of concrete evidence of retaliation."). Rather, compelled disclosure itself "'creates an unnecessary risk of chilling' in violation of the First Amendment." *Bonta*, 141 S. Ct. at 2388 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984)).

This is even more true here where the compelled disclosure threatens to chill Buckeye and similar 501(c)(3) organizations' political speech. "No form of speech is entitled to greater constitutional protection than" private political speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). And because federal law prohibits 501(c)(3) organizations from engaging in electioneering, *see* 26 U.S.C. § 501(c)(3), the potential for the compelled disclosure to chill *any* political speech is even more dire.

Further, even if proof of retaliation is needed, the burden to demonstrate it is light, especially "where—as here—the disclosure law fails to satisfy" narrow tailoring. *Bonta*, 141 S. Ct. at 2389. The IRS's utter failure to safeguard confidential taxpayer information, combined with Buckeye's acknowledgment that its donors fear retaliation, is more than enough to meet this burden. While the evidence of retaliation may be less compelling in this case than in *NAACP* or *Bonta*, "that difference speaks to the strength of the First Amendment interests asserted, not to their existence." *AFL-CIO*, 333 F.3d at 176.

"By collecting and aggregating confidential information about an organization's donors," Schedule B gives the IRS a "loaded gun." Brief for the NAACP Legal Defense & Education Fund, Inc. as *Amicus Curiae*, in *Ams. for Prosperity Found. v. Becerra*, 903 F.3d 1000 (2018), at 6. Rather than locking it in a safe, the IRS leaves this loaded gun out in the open, and 501(c)(3) organizations are left fearing they could be the next victim of a misfire.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

ADVANCING AMERICAN FREEDOM
FOUNDATION, et al.

*/s/ Frank M. Strigari*
Frank M. Strigari (OH 0078377)
ZAINO HALL & FARRIN LLC
41 South High Street
Suite 3600
Columbus, OH 43215
(614) 326-1120
fstrigari@zhflaw.com

J. Marc Wheat
General Counsel (Va. Bar No. 39602)
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

Jason Torchinsky (Va. Bar No. 47481)
Shawn Sheehy (Va. Bar No. 82630)
Daniel Bruce (Va. Bar No. 98120)

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808
jtorchinsky@holtzmanvogel.com
ssheehy@holtzmanvogel.com
dbruce@holtzmanvogel.com

*Counsel for Proposed Amici Curiae Advancing
American Freedom Foundation, et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2023, the foregoing was filed electronically with the Clerk of the Court for the United States District Court for the Southern District of Ohio by using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Frank M. Strigari*
Frank M. Strigari

*Counsel for Proposed Amici Curiae*
*Advancing American Freedom*
*Foundation, et al.*